**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A-2436-13T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

       Plaintiff-Respondent,

v.

J.C.,

       Defendant-Appellant,

and

C.M.,

       Defendant.

_____

IN THE MATTER OF
T.M., a minor.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| June 8, 2015 |
| APPELLATE DIVISION |

       Submitted May 4, 2015 — Decided June 8, 2015

       Before Judges Sabatino, Simonelli, and
       Guadagno.

       On appeal from the Superior Court of New
       Jersey, Chancery Division, Family Part,
       Essex County, Docket No. FN-07-456-12.

       Joseph E. Krakora, Public Defender, attorney
       for appellant (Beth Anne Hahn, Designated
       Counsel, on the brief).

       John J. Hoffman, Acting Attorney General,
       attorney for respondent (Andrea M.

Silkowitz, Assistant Attorney General, of counsel; Thomas Ercolano, III, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor T.M. (Lisa M. Black, Designated Counsel, on the brief).

The opinion of the court was delivered by

GUADAGNO, J.A.D.

Following a Title Nine fact-finding hearing, a Family Part judge determined that defendant J.C. (Jenny)[1] abused or neglected her then three-year-old son, T.M. (Tom). The judge found that on July 19, 2012, Jenny drank alcohol and remained in her bedroom through the following morning with the bedroom door closed, while Tom was in the next room unsupervised, wearing a dirty diaper, with the apartment door ajar.

On appeal, Jenny claims that the Division of Child Protection and Permanency (Division) failed to prove that she neglected her child. The Division and the child's Law Guardian urge us to affirm the judge's finding. Because Tom was not injured and Jenny's conduct did not rise to the level of gross negligence or reckless disregard for Tom's safety, we reverse.

---

[1] We employ pseudonyms to protect the privacy of the parties and for ease of reference.

A-2436-13T3

The Division first became involved with this family in August 2010, when it received a referral that Tom, who was then one year old, was living with Jenny and her mother, D.C. (Denise), in unsanitary conditions. The allegations were substantiated and the Division began to provide services for the family. It is not disputed that Jenny attended all recommended evaluations including psychological evaluations with Drs. Briana Cox and Mark Singer, a psychiatric evaluation with Dr. Samiris Sostre, a substance abuse evaluation with Catholic Charities, and a neuropsychological evaluation with Dr. Jonathan Mack.

Jenny told Dr. Cox that she smoked marijuana before Tom was born and drank alcohol occasionally. Cox recommended that Jenny submit to a substance abuse evaluation and a urine screening. Dr. Sostre concluded that Jenny had no acute symptoms of mood disorder, anxiety disorder, or psychiatric disorder that would require treatment and no psychiatric care was indicated. Dr. Mack recommended individual counseling by a psychologist and parent training. Neither Cox, Sostre, nor Mack made any finding of alcohol abuse.

Jenny submitted to a substance abuse evaluation with Catholic Charities on April 5, 2011. On several occasions in the report, the following comment is repeated:

> Client reports that she was 21 years of age
> when she first drank alcohol and will have
> an occasional social drink. Client reports
> one experimental use of marijuana when she
> was age 19, no more since that time.

Catholic Charities did not diagnose Jenny with a drug or alcohol disorder. Rather, it deferred diagnosis without further explanation.

In August 2011, Jenny submitted to a drug screen that was negative for drugs and positive for alcohol. After she again tested positive for alcohol in January 2012, the Division filed an order to show cause on March 8, 2012, seeking care and supervision of Tom pursuant to Title Thirty, N.J.S.A. 30:4C-12. The Family Part judge granted the application and told defendant that the Division wanted her to comply with the recommendations contained in Dr. Mack's report, specifically that she engage in counseling, cooperate with a home health aide, and receive parenting skills training. Defendant agreed.

Defendant returned to court on April 2, 2012 for a hearing on the return of the order to show cause. The caseworker told the judge that defendant's parenting class would begin on the following day and counseling within a few weeks. Although there had been no diagnosis of any alcohol-related disorder by any of Jenny's evaluators, the deputy attorney general (DAG) advised the court of an "update" that the Division had arranged for

Jenny to participate in an alcohol treatment program that was scheduled to begin on April 12, 2012. The DAG then requested that Jenny submit to a urine screen in the courthouse that day to screen for alcohol, even though the DAG was not sure the courthouse urine screens could detect alcohol. The judge asked Jenny if she would submit to the on-site urine screen. She replied that she would prefer to wait until her treatment began in ten days.

Jenny then asked why she was being required to participate in more services than were originally proposed at the March 8, 2012 hearing. Without questioning the basis of the DAG's recommendation, the judge told Jenny that the Division had alleged that she was "involved with using alcohol and [her] drinking . . . [was] of significant concern[] to them." The DAG then incorrectly represented to the court that Dr. Mack had recommended that Jenny participate in alcohol treatment.

Even though Jenny had not refused to participate in any of the services offered, the judge, perhaps relying on the misstatement by the DAG about Dr. Mack's recommendations, suggested that the Division "should be taking the child away from [Jenny] if she doesn't participate in all those services." The judge then characterized Jenny's questioning of the additional services as "wanting to fight back[.]" Although

Jenny had agreed to participate in all recommended services, the judge characterized her wish to postpone the urine screen as being "reluctant to participate in services[.]" The judge then suggested that the matter be converted from a Title Thirty to a Title Nine litigation and offered to list the matter for a fact-finding.

Around noon on July 20, 2012, Jordan Brown, a therapist assigned to provide counseling to Jenny, accompanied caseworker Kimberly Chalmers to Jenny's apartment for an intake appointment. They noticed that the door to Jenny's apartment was ajar, and when they knocked on the door and called for Jenny, there was no response. Chalmers pushed open the door and entered the apartment. She observed Tom walking around wearing a dirty diaper.

Jenny emerged from the bedroom, and Chalmers noticed she appeared disheveled and had alcohol on her breath. After Chalmers mentioned Tom's dirty diaper, Jenny initially told the child to "go get a Pamper and change yourself." When Chalmers suggested that Tom should be cleaned, Jenny went into the bathroom with the child, cleaned him up, and put a new diaper on him. When asked about the alcohol smell, Jenny stated that she had some of her girlfriends over the night before and they drank wine. She claimed that Tom had been with his father, who

dropped him off around 11:00 p.m. Jenny claimed her friends left and she had stopped drinking by 10:30 p.m. When asked about the door, Jenny explained that one of her girlfriends had been there earlier that morning and must have left it open.

After conferring with her supervisor, Chalmers told Jenny that the Division was going to remove Tom from her custody because of inadequate supervision and place him with Jenny's mother, Denise.

The Division filed a Title Nine complaint for custody on July 24, 2012, and sought a finding of abuse or neglect against Jenny. A fact-finding hearing was initially scheduled for August 16, 2012. On August 3, 2012, the court entered an order postponing the fact-finding to October 22, 2012. On October 22, 2012, Jenny appeared but the fact-finding was again postponed until November 9, 2012. On that day, Jenny did not appear and her counsel requested an adjournment as she had been unable to contact Jenny. Counsel explained that Jenny did not have a phone but she had attended that last hearing and thought she would want to attend the fact-finding. A Division supervisor, Kerline Fils-Aime, told the judge that the caseworker had gone to Jenny's home the day before but was not able to get in the building. The judge denied the adjournment, noting that the

fact-finding had already been postponed because of a hurricane[2] and he had to address an "enormous amount" of fact-findings and permanency hearings.

Fils-Aime testified based primarily on reports filed by Chalmers. She confirmed that after Jenny submitted to a substance abuse evaluation, there was no recommendation for follow-up care.

The Division also called Jordan Brown, who testified that when she and Chalmers entered the apartment, she noticed that it was dirty and smelled of alcohol. She also described Tom's diaper as "filthy," but explained that it was a white pull-up diaper, and appeared dirty on the outside. Brown did not observe the condition of the inside of the diaper. Brown also smelled alcohol on Jenny's breath.

At the conclusion of the Division's case, Jenny's counsel again asked the judge to continue the matter so that Jenny could testify. Counsel indicated that Jenny disputed the allegations and wanted to testify. Counsel also noted that Jenny had been present on October 22, 2012, when the matter was last scheduled for fact-finding. The judge denied the application, noting that Jenny "knew we needed to move this case. . . . She knew that this case was coming up. She knew that it had to be heard. If

[2] Hurricane Sandy struck New Jersey on October 29, 2012.

A-2436-13T3

she wanted an opportunity to testify she should have been here, she should have known."

The judge rendered an oral decision, finding both witnesses called by the Division "very credible," even though Fils-Aime was not present on July 20, 2012, had no first-hand knowledge of the events of that day, and did little more than recite information contained in Division reports. The judge observed that the caseworker found that Jenny's apartment had roaches and was "filthy," although he acknowledged that this may be a better indicator of poverty than child abuse.

The judge also found that the Division had provided services to Jenny "to address issues of alcohol . . . as well as drugs." The judge concluded that Jenny "was familiar with . . . [t]he fact that there was a drug and alcohol problem." The judge noted that when the caseworker and Brown spoke with Jenny, they noticed alcohol on her breath. Jenny told the caseworker that she had stopped drinking when her friends left at 10:30 p.m., and she did not drink after Tom was returned to her at 11:00 p.m. The judge rejected this statement based on a sua sponte calculation of Jenny's alcohol metabolism:

> Alcohol generally burns off a[t] one ounce of alcohol per hour. Four ounces of wine, one ounce of vodka. If you stop drinking at 10:30 the night before you would not still have alcohol on your breath and still be in bed by noon the following day. [Y]ou might

be there with a hangover, but you wouldn't
have alcohol fresh on your breath.

Employing this analysis, the judge concluded that Jenny "had been drinking and had been drinking much later during a period of time while this child was in her sole custody." The judge also noted that, because the door to the apartment was ajar, Tom could have walked out and fallen down the steps without Jenny knowing because her bedroom door was closed.

The judge was also critical of Jenny's initial decision to have Tom change his own pull-up diaper, "without any sort of hygiene to address what may very well have been on a two-year old over an extended period of time."[3] The judge concluded that it

> seems [a] fair and reasonable inference to make if the diaper was so old and dirty on the outside, that it must have been on there for a long period of time. And children need to use facilities more often than that. So that it would have been important, at least for her, as a mother to check and see whether the child needed some care before simply placing another diaper on the child.

The judge found that the Division had proven that Jenny abused or neglected Tom and entered an order with the following conclusions:

---

[3] Chalmers testified at the hearing on the order to show cause that, after she urged Jenny to clean Tom, Jenny took the child into the bathroom, cleaned him up, and he came out wearing a clean Pamper.

> [Jenny] has failed to attend her court ordered substance abuse treatment on a consistent basis. [Jenny's] apartment smelled of alcohol, she admitted to drinking alcohol until 10:30 p.m. the night before and she still had alcohol on her breath at 12 p.m. on July 20, 2012 when the Division worker and a therapist arrived for a scheduled appointment. [Jenny] was not dressed and asleep behind a closed bedroom door and the apartment door was left open. The child was wandering around the apartment, unsupervised and with a dirty diaper. [Jenny] failed to appreciate the risk of harm that the situation presented to her child.

Jenny attended thirty-two group and individual sessions at The Bridge Addiction Services (Bridge). On October 19, 2012, Bridge provided a report to the Division indicating that "[Jenny] has attended all scheduled activities and continued to submit negative urine drug screens. Based on her level of participation she is on track to complete treatment on November 20, 2012."

The parties next appeared in court on February 25, 2013, for a compliance review. Based on the Division's recommendation, the judge ordered that Tom could be reunified with Jenny and legal and physical custody of him could be transferred to her without further of the court. In spite of this order and Jenny's completion of services, Tom was not reunified with Jenny until August 22, 2013. Litigation was terminated in December 2013 and this appeal followed.

A-2436-13T3

On appeal, defendant raises the following arguments:

THE APPELLANT WAS DENIED DUE PROCESS AND THE DIVISION FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE APPELLANT NEGLECTED HER CHILD.

POINT I

THE APPELLANT WAS DENIED DUE PROCESS.

A. THE COURT INAPPROPRIATELY THREATENED THE APPELLANT AT THE ORDER TO SHOW CAUSE FOR CARE AND SUPERVISION.

B. THE TRIAL COURT ERRED IN DENYING APPELLANT THE RIGHT TO TESTIFY.

POINT II

THE DIVISION FAILED TO PROVE THAT APPELLANT NEGLECTED HER CHILD.

A. INADEQUATE SUPERVISION

B. MEDICAL NEGLECT

C. ENVIRONMENTAL CONDITIONS

D. INDIVIDUALS WITH INTELLECTUAL DISABILITIES

II.

An "abused or neglected child" is defined as:

a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting

12

or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]

[N.J.S.A. 9:6-8.21(c)(4)(b).]

Where, as here, there is no actual harm alleged, the court must focus on "the likelihood of future harm," taking into consideration events after the removal "if causes for concern have been significantly alleviated." N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 24 (App. Div. 2004), certif. denied, 182 N.J. 426 (2005). We therefore must determine whether Jenny failed to exercise a minimum degree of care when she drank on the evening of July 19, 2012, and slept late the next morning, leaving Tom unsupervised, wearing a dirty diaper, and with her apartment door ajar.

In G.S. v. Department of Human Services, 157 N.J. 161, 177-78 (1999), the Court discussed the "minimum degree of care" standard and determined that it refers to conduct that is grossly or wantonly negligent, but not necessarily intentional. We applied this standard in New Jersey Department of Youth & Family Services v. J.L., 410 N.J. Super. 159, 161 (App. Div. 2009), in reversing a finding of abuse or neglect against the mother of a three-year-old and a five-year-old who allowed them to walk from a playground to their home while she remained at

the playground.  After the children entered their home, a child-proof door closed behind them, locking them in.  Id. at 161-62.  They called 9-1-1 and the police arrived to unlock the door.  Id. at 162.  Although the children were upset, they were unharmed.  Ibid.  In reversing, we found that the mother's conduct, "although arguably inattentive or even negligent," did not meet the requisite standard contemplated by G.S.  Id. at 168.

The Supreme Court considered a similar case of inadequate supervision in Department of Children & Families, Division of Youth & Family Services v. T.B., 207 N.J. 294 (2011).  In T.B., the Court reversed a finding of neglect against the mother of a four-year-old, who left the child in his grandparents' home mistakenly believing that the grandparents, who frequently cared for the child, were home.  Id. at 296.  The child woke up, found that no one was home, and walked across a street to a neighbor's house.  Id. at 297.  The police were contacted and the Division was notified.  Ibid.  The Division later determined that the mother had neglected the child.  Id. at 298-99.  The Court held that the mother's failure to check to see if the grandparents were home before she left was negligent but did not rise to the level of gross negligence.  Id. at 309.

Here, the March 8, 2012 order granting the Division care and supervision of Tom directed the Division to refer Jenny for parenting skills, individual therapy, and a substance abuse evaluation. Evaluations of Jenny by Doctors Cox, Singer, Sostre, Mack, and Catholic Charities failed to identify any drug or alcohol abuse problem.

In March 2012, when the judge concluded that Jenny was aware that she had "a drug and alcohol problem," there was nothing in the record to support either the existence of a problem or her awareness of same.[4] Not only did the evaluators find no alcohol issue, but Jenny consistently maintained that she drank in moderation and not when Tom was around. The judge's conclusion that the smell of alcohol on Jenny's breath was proof that she continued to drink alcohol after Tom was returned home was speculation. Even if Jenny had continued to drink, as the judge surmised, and slept in late the next morning as a result, there is no proof that her behavior created a substantial risk of harm to Tom. See N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 331 (App. Div. 2011) (reversing finding of neglect against father who refused to attend substance abuse treatment and tested positive for cocaine

_____

[4] On April 12 and 16, 2012, Jenny tested positive for THC, the primary component of marijuana.

and marijuana during supervised visits because there was no proof of actual harm to child and no expert evidence that father posed a risk during visits).

Tom never left the apartment and Jenny changed his diaper,[5] albeit after being prompted by the caseworker. Further, there was no proof that Jenny was aware that her apartment door was left ajar and her explanation that a friend who visited earlier that day left the door open was not challenged.

To hold that a parent who, on a single occasion, has too much to drink and sleeps in late the next day while his or her child walks around in a dirty diaper commits child abuse would classify many otherwise responsible parents as child abusers. See ibid. ("The Division would be quickly overwhelmed if law enforcement was required to report every individual under the influence who had children."). Simply put, there was no proof of harm to Tom, or that Jenny's conduct met the statutory standard of abuse or neglect. Even if we accepted the court's finding that Jenny "failed to attend her court ordered substance

---

[5] We are aware of the importance of providing proper hygiene to children and that the failure to change a toddler's diaper can result in complications. See Ch Li, Zh Zhu, & Yh Dai, Diaper Dermatitis: a Survey of Risk Factors for Children Aged 1 — 24 Months in China, 40 J. Int'l Med. Res. 1752 (2012). However, no proof was presented that Tom suffered any resultant health consequences from wearing the dirty diaper.

abuse treatment on a consistent basis," that does not constitute abuse or neglect as a matter of law.  Id. at 332.

As we find the evidence insufficient to support a finding of neglect, we need not consider the other claims raised. However, we feel compelled to address the following issues.

When the DAG informed the court on April 2, 2012, that Dr. Mack had recommended alcohol treatment services and the Division had arranged for Jenny to participate in a treatment program, the court accepted the representation without question.[6]  When Jenny understandably asked why she was being required to complete additional services, the judge commented that she was fighting back and suggested that her child would be taken away "if she doesn't participate in all those services."

Services provided by the Division should be designed to address an area of legitimate concern and not imposed arbitrarily.  See N.J. Div. of Youth & Family Servs. v. I.S.,

---

[6] We stress the importance of accuracy in representations made to the court by the Division's attorneys about an evaluator's treatment recommendations.  The judges who hear children-in-court cases typically handle high volumes and must make critical, fact-sensitive decisions about the welfare of children under significant time pressures.  Their judicial functions are surely hampered where, as here, the DAG misrepresented the services that an expert evaluator had recommended a parent to receive.  This case illustrates how such a misstatement, although presumably unintended, can materially affect a case and divert it down the wrong path, resulting in this child's removal and separation from his mother for more than a year.

202 <u>N.J.</u> 145, 178 (2010) (criticizing Division for requiring father who had successfully raised four children to complete "utterly irrelevant" parenting classes).  Before ordering compliance with a particular service recommended by the Division, a judge should be satisfied that there is a legitimate basis and real need for it.  Failure to do so may cause unnecessary delays and discourage otherwise willing parents from compliance with needed services.  The Division's claim and the judge's conclusion that Jenny had an alcohol problem is untethered to any record evidence in this case and thus formed an inappropriate basis for the finding of neglect.

We reject the Division's argument that a defendant in a Title Nine fact-finding hearing does not have a right to testify.  Due process is a constitutional right that must be "scrupulously protected" by our courts.  <u>N.J. Div. of Youth & Family Servs. v. G.M.</u>, 198 <u>N.J.</u> 382, 397 (2009).  At a minimum, due process requires that a parent charged with abuse or neglect have "adequate notice and an opportunity to prepare and respond[.]"  <u>N.J. Div. of Youth & Family Servs. v. N.D.</u>, 417 <u>N.J. Super.</u> 96, 109 (App. Div. 2010).

The request for a continuance to allow Jenny to testify required more than a conclusory reference to the court's backlog in denying her application.  This error was amplified when the

court categorically rejected Jenny's "version of the events" that she stopped drinking at 10:30 p.m., without at least hearing her testimony and evaluating her credibility and demeanor.

Finally, we reject the Division's argument that because "[Jenny] was reunified with her son and legal custody was transferred back to [her, she] suffered no harm by not being able to testify[.]"  As to the child, given the questionable circumstances surrounding this removal and the excessive delay in reunification, we are compelled to reemphasize the harmful effects that improvident removal can have on young children. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 610 (1986) (citation omitted).  As to Jenny, our courts have repeatedly acknowledged the "significant and longstanding adverse consequences" that may result from a parent's placement on the child abuse registry.  N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 179 (2014); N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 25 (2013).

Reversed.  The Division is directed to remove defendant's name from the Child Abuse Registry within ten days of the date of this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2436-13T3