# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1302-17T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

     Plaintiff-Respondent,

v.

E.D.,

     Defendant-Appellant,

and

A.A.,

     Defendant.

_____

IN THE MATTER OF K.A., a Minor.

_____

          Submitted September 24, 2018 – Decided October 25, 2018

          Before Judges Fasciale and Rose.

          On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0448-16.

Joseph E. Krakora, Public Defender, attorney for appellant (Beth Anne Hahn, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Carlos J. Martinez, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (David B. Valentin, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant E.D.[1] appeals from an October 12, 2016 order[2] of the Family Part finding she abused or neglected her son while caring for him when she was impaired by prescription medication. We reverse, concluding the trial court's factual findings are not supported by the record.

I.

We derive the salient facts from the limited record developed at the brief fact-finding hearing. Defendant is the biological mother of K.A., born in June 2003. At the time of the incident, the household was comprised of: K.A.;

---

[1] We use initials to protect the privacy of the parties. See R. 1:38-3(d)(12).

[2] The order became appealable as of right after the trial court entered a final order on October 4, 2017, terminating the protective services litigation.

defendant; her two adult sons, C.D., then twenty-nine years old, who suffered from bipolar disorder, and J.P., then eighteen years old, who was undergoing treatment for Hodgkin's lymphoma; and L.M., defendant's adult physically disabled nephew. Neither L.A., defendant's twenty-five-year-old daughter, nor A.A., K.A.'s biological father, resided with the family. However, A.A. was "consistently present" and, for example, assisted K.A. with his homework. W.C., a home health aide provided services to the family three times per week, and another home health aide assisted L.M. with his needs.

Following an initial referral in September 2015 that was deemed unfounded, the Division of Child Protection and Permanency (Division) offered the family services to address defendant's mental health concerns. On March 15, 2016, the Division received a referral from the Essex County Substance Abuse Initiative (SAI), a public assistance agency, reporting that defendant tested positive for cocaine.

The next day, Keith Massey, a Division investigator, interviewed defendant in her home. Defendant disputed SAI's allegations, claiming her use of prescription medication could have caused a false positive test result. Defendant claimed she used prescription medication to treat her depression,

stemming from her dire financial circumstances, J.P.'s lymphoma diagnosis, and her responsibility for her disabled nephew.

Accompanied by Division permanency worker, Ebony Connor, Massey returned to the home the next day, and interviewed K.A., J.P., C.D., and W.C. By all accounts, defendant's ability to care for K.A. was not a concern; no one reported having observed defendant use cocaine or any other illegal drugs; and K.A. appeared healthy and well-cared for. At most, W.C. indicated defendant's prescription medication "for depression, anxiety disorder, [and] arthritis . . . at times . . . makes her sluggish and at times, unresponsive, [but] not to the level where she has no mental control, or is unable to care for her household."

During the following month, Connor had several contacts with defendant and collateral sources. Two days before the incident that formed the basis for this appeal, defendant claimed she did not know why her drug tests were positive for amphetamines, but admitted that she had "borrowed a few Percocet from her mother."

Connor and another caseworker scheduled a home visit with defendant on April 28, 2016. Massey did not accompany the workers, but he was the sole witness to testify at the fact-finding hearing. His investigation summary which, in part, was "cut and pasted" from Connor's notes, was admitted in evidence. A

chronology of the events that transpired on April 28 is crucial to our analysis. We glean the times of day from Massey's investigation summary.

At approximately 1:00 p.m., Connor and a coworker arrived at defendant's home for a scheduled visit. Although Connor knocked on the door for several minutes and telephoned defendant, she did not respond. Connor then contacted C.D., who returned home at 1:20 p.m. and escorted the Division workers into the home. When the workers entered, defendant "walked down the stairs." Defendant admitted she failed to attend an appointment at her substance abuse program, but claimed she did not have a ride and needed to attend to L.M.'s needs. Defendant told the workers she had rescheduled the missed appointment for April 30.

At 1:47 p.m., Connor contacted the counseling center and was advised that defendant had not rescheduled her appointment. Sometime between 1:47 p.m. and 2:02 p.m., Connor "observed that [defendant] had slurred speech, her eyes were glossy [sic] and she was unable to stand unassisted." In response to Connor's inquiry, defendant denied that she had taken any medication.

At 2:02 p.m., Connor attempted to contact A.A., but he did not answer his telephone. The "[w]orkers returned to the home and spoke with [defendant] privately in her bedroom." Defendant admitted that she had ingested a

5

combination of prescription and non-prescription medication and vitamins, i.e., naproxen, Tylenol, bupropion XL, pseudoephedrine HCL, ferrous sulfate, omeprazole, sertraline, amoxicillin, and vitamins D and B-12.[3] During that conversation, defendant "was unable to sit on her bed. She was stumbling and unable to sit up unassisted." Connor addressed that behavior with defendant, who responded, "oh really." When asked to identify family resources "in the event the Division had to remove [K.A.] from her care due to her current state[,]" defendant identified L.A., but could not provide her address or phone number, then "'flopped' on the bed." Defendant was able to contact A.A. who told the workers he would come to the home "in about [forty-five] minutes." J.P. came into defendant's bedroom "[a]t that time."

At 2:30 p.m., Connor spoke with C.D. who advised that he was diagnosed with bipolar disorder. C.D. also stated that he was prescribed Risperdal to treat his condition but that "nobody can make [him]" take the medicine, which makes him "aggressive."

When A.A. arrived at 3:00 p.m., he escorted the workers inside the home where they detected "a strong gas odor." A.A. shut off the stove, then

---

[3] The medication and vitamins, along with their prescribed dosages, were listed in Massey's investigation summary, but the Division did not present any evidence as to their intended use or contraindications when ingested together.

determined defendant was upstairs sleeping. The record does not reveal who turned on the stove or whether J.P and C.D. were still present in the home at that time.

At 3:50 p.m., K.A. arrived home from school. When the workers reentered the home with A.A. and K.A., defendant "was sitting in the living room and stated to the workers[,] 'I don't see the big deal of all this . . . if there was a fire or emergency, I know how to do CPS[,]'" demonstrating on her stomach and confirming she meant "CPR." Defendant's physical appearance at that time is not noted in the record. The workers removed K.A. from the home and placed him with A.A.

At the fact-finding hearing on October 11, 2016, as noted above, Massey's investigation summary was admitted in evidence, but the court granted defendant's application to disregard hearsay statements pertaining to defendant's drug test results and K.A.'s performance at school. The Division also moved in evidence a screening summary, but only for purposes of demonstrating that a referral was made to the Division on March 15, 2016. Defense counsel did not object to any other evidence proffered by the Division, including Massey's testimony in general. Defendant did not testify, and no witnesses testified on her behalf. The law guardian did not present any evidence.

A-1302-17T2

Massey's testimony generally was consistent with his investigation summary. He explained that, as an investigator, it was his regular practice to include contacts and observations made by permanency workers in his report. Because he was not present at defendant's home on April 28, 2016, he conceded he had no first-hand knowledge of the events that transpired.

Nonetheless, in an oral decision rendered on the record at the conclusion of summations on October 11, 2016, the court determined Massey was credible because "[h]e was quite clear about what he knew independently and what he was told by other Division workers" and he did not "testify as to what he did not know." In addition to Massey's testimony, the court considered the exhibits in evidence and found the Division proved by a preponderance of the evidence, that defendant "created a substantial risk of harm to . . . [K.A.], through her continued use of drugs while she was responsible for [K.A.] in her care, and her failure to address her substance abuse issues even though she had been working with the Division."

To support its conclusion, the court cited defendant's admission two days prior to the incident that she had taken drugs that were not prescribed to her; and Connor's observations of defendant on the day of the incident, including defendant's "glossy" eyes, slurred speech, and inability to walk without

assistance. The court also noted that the Division had been working with defendant to address her substance abuse issues, but she did not comply with counseling and admitted to ingesting "numerous drugs."

Although K.A. was not present when the gas leak occurred, the court found there was "sufficient reason to believe that [defendant] was in absolutely no condition to deal with this problem no matter how it occurred." The court was not persuaded that "there were other people living and working in the home . . . the two older children, . . . an aide for the nephew, . . . [and] an aide to assist [defendant]." Rather, the court determined "it was [defendant's] responsibility to care for [K.A.]." While the court recognized that, at twelve years old, K.A. "was not an infant, . . . he was still a child . . . who could not care for himself." Further, although defendant did not believe that "her drug screens were positive," the court found "her behavior . . . on April 28th[] sorely contradict[ed] that statement." This appeal followed.

On appeal, defendant contends there was insufficient evidence to support the trial court's finding she abused or neglected K.A. Citing Department of Children & Families, Division of Child Protection & Permanency v. E.D.-O., 223 N.J. 166, 181 (2015), defendant claims the record does not support the court's determination that defendant exposed K.A. to an "imminent danger or

substantial risk of harm."  For the first time on appeal, defendant claims the court should not have admitted Massey's investigation summary in evidence, and expert testimony was necessary to explain how defendant's medication affected her ability to supervise K.A.  The Division and law guardian urge us to affirm the court's order.

II.

Ordinarily, we defer to the Family Court's factual findings, as long as they are supported by substantial credible evidence in the record.  N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010); N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007).  However, we will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been made."  M.M., 189 N.J. at 279.  "Where the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' we expand the scope of our review."  N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citation omitted).  We also accord no deference to the trial court's legal conclusions, which we review de novo.  State v. Smith, 212 N.J. 365, 387 (2012); see also Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A-1302-17T2

The Division "must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). In pertinent part, an "abused or neglected child" is defined as:

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

Courts need not wait for harm to occur, but the Division must present proof of "imminent danger or a substantial risk of harm to a child . . . ." E.D.-O., 223 N.J. at 178 (quoting N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 23 (2013)). Also, "[t]o find abuse or neglect, the parent must 'fail[] . . . to exercise a minimum degree of care.'" Id. at 179 (alteration in original) (quoting N.J.S.A. 9:6-8.21(c)(4)(b)). A "minimum degree of care" encompasses "conduct that is grossly or wantonly negligent, but not necessarily intentional." Ibid. Wanton negligence is conduct that is engaged in with the parent's knowledge that injury is likely to result. Ibid. Mere negligence does not trigger

11

the statute. <u>Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B.</u>, 207 N.J. 294, 306-07 (2011); <u>G.S. v. Dep't of Human Servs. Div. of Youth & Family Servs.</u>, 157 N.J. 161, 172-73 (1999). Our "[Supreme] Court has emphasized that whether a parent's conduct is negligent or grossly negligent requires an evaluation of the totality of the circumstances." <u>E.D.-O.</u>, 223 <u>N.J.</u> at 170-71.

Moreover, whether a parent has failed to exercise a minimum degree of care "is fact-sensitive and must be resolved on a case-by-case basis." <u>Id.</u> at 192. The Court has warned, however, that in undertaking this analysis, trial and appellate courts "must avoid resort to categorical conclusions." <u>Id.</u> at 180 (citing <u>T.B.</u>, 207 N.J. at 309). For example, in <u>E.D.-O.</u>, the Court rejected a "categorical rule" that leaving a child in a motor vehicle for any length of time automatically constitutes abuse or neglect. <u>Id.</u> at 192-93.

While we continue to recognize the societal concern that parents should not care for children while under the influence of drugs, we have avoided a categorical approach in cases involving the mixture of drugs and parenting. In <u>New Jersey Division of Youth & Family Services v. V.T.</u>, 423 N.J. Super. 320, 332 (App. Div. 2011), we recognized "not all instances of drug ingestion by a parent will serve to substantiate a finding of abuse or neglect." Indeed, "Title 9

12

is not intended to extend to all parents who imbibe illegal substances at any time. The Division would be quickly overwhelmed if law enforcement was required to report every individual under the influence who had children." Id. at 331.

In V.T., proof of a parent's drug use by itself was not enough to sustain a finding of abuse or neglect, where a father used drugs prior to his visits with an eleven-year-old child. Ibid. We held that a father's use of cocaine and marijuana and failure to complete drug treatment did not "inherently create[] a substantial risk of harm" to the child. Id. at 330. We noted there was no expert proof showing how the father's drug use posed a risk of harm to the child. Id. at 331.

Similarly, we reversed a finding of abuse and neglect based solely on a mother's use of marijuana, on one occasion, while the child was in her care. N.J. Div. of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 468-70 (App. Div. 2014). We noted the absence of detailed proof regarding the "circumstances of her ingestion," whether "the baby was solely in her mother's care when she was intoxicated," and "the magnitude, duration, or impact" of the intoxication. Id. at 470.

Further, in New Jersey Division of Child Protection & Permanency v. J.C., 440 N.J. Super. 568, 573 (App. Div. 2015), we reversed a finding of abuse or neglect where the mother drank alcohol to excess then overslept the next

13

morning, when her toddler was found in the apartment with a dirty diaper and the door ajar. Under those circumstances we observed,

> To hold that a parent who, on a single occasion, has too much to drink and sleeps in late the next day while his or her child walks around in a dirty diaper commits child abuse would classify many otherwise responsible parents as child abusers. Simply put, there was no proof of harm to [the child], or that [the mother]'s conduct met the statutory standard of abuse or neglect. Even if we accepted the court's finding that [the mother] "failed to attend her court ordered substance abuse treatment on a consistent basis," that does not constitute abuse or neglect as a matter of law.

> [Id. at 579. (citation omitted).]

Applying these principles, we are unpersuaded that defendant abused or neglected K.A. under the circumstances presented in this case. Defendant's behavior neither placed K.A. in "imminent danger" nor exposed him to a "substantial risk of harm."

Initially, although defendant admitted ingesting a number of prescription drugs and vitamins at some point on April 28 when K.A. was not present, the Division did not establish that the resulting effects of that combination of substances impacted defendant's ability to supervise K.A. Indeed, it is unclear from the record when defendant became adversely affected by the medication, and whether she was still impaired when K.A. returned home from school.

A-1302-17T2

Specifically, the investigation summary reveals that when Connor first entered defendant's home at 1:20 p.m., defendant "walked down the stairs." The report is silent as to whether defendant needed assistance walking at that time. However, by 1:47 p.m., Connor noted defendant "was unable to stand unassisted" and, by 2:02 p.m., she was "unable to sit up unassisted." The investigation summary does not specify defendant's physical condition when K.A. returned home at 3:50 p.m., other than to note she "was sitting in the living room." It is, therefore, unclear whether, or to what extent, defendant was impaired when K.A. arrived home.

Even if K.A. were present when defendant was impaired, that would not suffice for a finding of abuse under the totality of the circumstances presented here. In particular, the Division did not present any evidence as to how K.A.'s physical, mental or emotional condition might have been impacted by defendant's impairment. See R.W., 438 N.J. Super. at 470; see also A.L., 213 N.J. at 29-30 (stating that a parent's drug use, standing alone, is not enough to sustain a finding of abuse or neglect). For example, rather than present the testimony of a school official who could have testified to K.A.'s academic performance, that evidence was excluded from the investigation summary as embedded hearsay. See N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J.

Super. 478, 496-97 (App. Div. 2016) (recognizing that reports admitted pursuant to Rule 5:12-4(d) are subject to other hearsay limitations, including those imposed by N.J.R.E. 805 concerning embedded hearsay statements). Instead, one month prior to the incident, no one in the household, including the Division's home health aide, expressed any concerns about defendant's ability to care for K.A.

Moreover, there is no evidence in the record to support the court's determination that K.A. "could not care for himself" in these circumstances. K.A. was twelve years old and able to tell the workers when they first visited the family that he felt safe with defendant. His main concern when he was removed from the home was whether he could continue to play baseball if he lived with A.A. The record is devoid of any indication that he either was cognitively or physically impaired. Thus, it is more likely than not that, had K.A. arrived home and found his mother incapacitated with neither his brothers nor the home health aides present, K.A. would have been capable of calling his father or the police for assistance. See N.J Div. of Youth & Family Servs. v. J.L., 410 N.J. Super 159, 162 (App. Div. 2009) (wherein a six-year-old child had the wherewithal to contact the police when he and his younger brother were locked out of their home).

We also reject the Division's argument that the facts of the present case are distinguishable from those in J.C. because that "court had no evidence that the mother was impaired as a result of alcohol consumption." Like defendant's admission to ingesting prescription medication and vitamins here, the defendant in J.C. "admitted to drinking alcohol until 10:30 p.m. the night before and she still had alcohol on her breath at 12[:00] p.m. . . . when the Division worker and a therapist arrived for a scheduled appointment." J.C., 440 N.J. Super. at 576. Unlike here, however, when the Division arrived they found J.C.'s three-year-old son alone. Id. at 573. By contrast, K.A. was twelve years old and not present when the Division arrived.

Finally, even if we accepted the trial court's determination that defendant refused to comply with services, "that does not constitute abuse or neglect as a matter of law." Id. at 579. This is especially so where, as here, defendant's drug test results were excluded from evidence. Other than listing the medication and dosage of each medication in the investigation summary, the Division failed to establish the medical or psychological condition for which each medication was prescribed, or whether interactions could produce side-effects.

Because we find the record does not support the trial court's findings, we need not reach defendant's remaining arguments, raised for the first time on

17

appeal, that the investigation summary was erroneously admitted in evidence and expert testimony was necessary to explain how defendant's medication affected her ability to supervise K.A. Briefly, however, we take this opportunity to remind trial courts that, while the Division's records generally are admissible pursuant to Rule 5:12-4(d), the admission of an investigation summary through a witness, such as Massey, who does not have first-hand knowledge of the incident at issue, is fraught with peril. Cf. R.W., 438 N.J. Super. at 468 ("caution[ing] trial judges in contested cases who render fact-findings based solely on documentary submissions . . . .").

We also observe that the Division's reliance on Connor's observations of defendant's condition, whether or not the worker testified, are inconclusive as to defendant's impairment. While it is well-settled that lay witness testimony may be sufficient evidence of alcohol intoxication, State v. Guerrido, 60 N.J. Super. 505, 509-11 (App. Div. 1960), "expert testimony remains the preferred method of proof of [drug-induced] intoxication[,]" pursuant to N.J.R.E. 702. State v. Bealor, 187 N.J. 574, 592 (2006).

In Bealor, the Court recognized law enforcement officers are required, as part of their basic training, to receive specialized training "in detecting drug-induced intoxication." Id. at 592-93. Absent from the investigation summary

here, however, is any evidence that Connor was qualified as an expert in drug intoxication, or had training in the recognition of drug intoxication or the side-effects of mixing prescription medications. See id. at 592. Because Connor did not testify, the extent of her training, if any, was not developed in the record.

In sum, the Division failed to present sufficient, credible evidence that K.A. was in imminent danger or at a significant risk of harm as a result of defendant's failure to exercise a minimum degree of care. Our decision should not be understood to condone defendant's misuse of prescription drugs, as claimed by the Division. However, because the evidence was insufficient to establish abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b), we are constrained to reverse the trial court's decision and order the Division to remove the April 28, 2016 incident from defendant's existing entry in the Central Registry.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1302-17T2