# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4635-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.J.,

      Defendant-Appellant,

and

J.M.,

      Defendant-Respondent.

_____

IN THE MATTER OF A.J.,

      a Minor.

_____

      Argued April 2, 2019 – Decided April 17, 2019

      Before Judges Hoffman and Geiger.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Warren County, Docket No. FN-21-0146-17.

Clara S. Licata, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Clara S. Licata, on the briefs).

Cary L. Winslow, Designated Counsel, argued the cause for respondent J.M. (Joseph E. Krakora, Public Defender, attorney; Cary L. Winslow, on the brief).

Amy M. Mc Kinsey, Deputy Attorney General, argued the cause for respondent New Jersey Division of Child Protection and Permanency (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Amy M. Mc Kinsey, on the brief).

Todd S. Wilson, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Todd S. Wilson, on the brief).

PER CURIAM

In this appeal, we review an abuse and neglect judgment issued against defendant J.J. and the subsequent disposition order transferring custody of her then three-year-old son, A.J. (Adam),[1] to J.M. (Joel), his father. J.J. seeks

---

[1] For ease of reference and to preserve the anonymity of the parties, we refer to the child, his father, and his maternal grandmother by fictitious names.

reversal of the judgment, contending the Division of Child Protection and Permanency (the Division) failed to prove by a preponderance of the evidence that she placed Adam in imminent danger of impairment or that she acted recklessly or with gross negligence while caring for him. J.J.'s asserts the trial court erred when it received testimony concerning her positive drug screen results collected after the emergency removal of Adam and her failure to complete two substance abuse programs. Regarding the disposition order placing Adam with Joel, J.J. contends the trial court's concerns about her parental fitness apply equally to Joel.

Following our review of the record, we conclude J.J.'s argument's lack substantive merit. The record clearly supports the court's abuse and neglect judgment premised on J.J.'s gross negligence. We likewise find no harmful error in the court's receipt of testimony demonstrating J.J.'s positive drug screen results and her failure to remediate the conditions that endangered Adam, precipitating his removal. Furthermore, we discern no error in the court's order placing Adam in the physical custody of Joel, after determining that J.J.'s ongoing substance abuse issues precluded returning Adam to her physical custody.

A-4635-17T4

# I.

The record reveals the following facts relevant to this appeal. In the early morning hours of January 31, 2017, Washington Township police received a report of a lost and found child. When the responding officer arrived at the scene, the caller explained he awoke upon hearing a child running and yelling in the hallway. Although the caller did not know the child, he took the child into his apartment to keep him safe, after finding him unsupervised and shivering in the hallway, wearing only a pair of pants.

The child identified himself to the officer as Adam. When the officer asked where he lived, Adam guided the officer to apartment 402 but no one answered the door. The officer then contacted the building's superintendent and asked if anyone with Adam's last name lived in the building. The superintendent escorted the officer and Adam to apartment 102, J.J.'s apartment.

The officer noted the door to apartment 102 was ajar with a chain lock in place. He concluded Adam probably left the apartment through the opening between the door and the frame. After loud knocks and shouts elicited no response, the officer forced his way in and located J.J. sleeping in the apartment's bedroom. The officer tried waking J.J. by shouting at her, without success; after he shook her, J.J. finally awoke.

A-4635-17T4

Upon learning what occurred, J.J. started screaming at Adam. When the officer attempted to calm her down, J.J. explained she was angry because this was not the first time Adam managed to get out of the apartment undetected. The officer showed J.J. the damage to the trim around the door he forced open to enter the apartment. At that point, J.J. admitted the door was previously forced open during a narcotics raid. A record check revealed fourteen prior incidents of police involvement with J.J., but no prior convictions. The officer did not file any charge against J.J.; instead, he left Adam in J.J.'s care, after she acknowledged she needed to change the lock on her door. Nevertheless, the officer reported the incident to the Division.[2]

The next day, the Division responded to J.J.'s apartment to investigate the report. The caseworker noted a strong odor of cigarettes and possible marijuana emanating from the apartment. Adam was with J.J's mother at the time of the visit. J.J. expressed confusion about the necessity of the visit because "it wasn't

---

[2]  J.J. had been known to the Division since June 2005. The Division substantiated J.J. for abuse or neglect in 2007 after she tested positive for marijuana at the time of her child's birth, missed a number of prenatal visits, and lacked appropriate housing. In addition, the Division previously removed three other children from J.J.'s care due to ongoing marijuana use and significant domestic violence. J.J. surrendered her parental rights to two of the children and the court involuntarily terminated her parental rights to the third.

[her] fault that [Adam] got out the other night." She claimed she did not hear Adam leave the apartment. The caseworker observed a single, shared bedroom with separate beds.

J.J. said she last smoked marijuana the previous month, claiming she restricted her usage to times when Adam was with her mother, L.W. (Lisa). During the interview, Lisa and Adam returned to the apartment. The caseworker noted Adam as a bright three-year-old boy. Adam could not recall why he left the apartment the night before; he merely repeated "the cops came and banged the door down."

The caseworker also interviewed Lisa, who advised she was "always around to keep an eye on [J.J.] and [Adam,] to make sure that she stays on the right track." Lisa reported regularly caring for Adam. The caseworker noted Lisa is hard of hearing and relies on lip reading. The caseworker observed enough food in the home for both J.J. and Adam. J.J. pointed out the fridge door was locked when not in use due to Adam's habit of opening doors. At the end of the visit, the caseworker requested J.J. to come to the local Division office within an hour for a urine screen. J.J. claimed she did not need a ride when offered, and said she would stop by after she completed some grocery shopping.

6

Later the same day, the caseworker returned to J.J.'s apartment, after she failed to appear for the urine screen. J.J. stated she did not go to the office because she did not "feel like doing things that people want [her] to do . . . unless it is court ordered." Nevertheless, J.J. did complete the urine screen at the office, and also submitted to a substance abuse evaluation. At the Division's request, J.J. also signed an Intake Family Agreement, wherein she agreed "to ensure appropriate supervision of [Adam,]" to acquire "a more appropriate lock" for her apartment door, and "to not use [m]arijuana while in a caretaking role of Adam."

The substance abuse evaluation indicated J.J. needed intensive out-patient treatment; however, she rejected the recommendation, claiming she did "not need any help," nor did she want to take any time away from her son. She stated she would have her prescription for Xanax refilled if her anxiety flared up. Significantly, she told the evaluator she "last smok[ed] marijuana yesterday, when she smoked [one] joint."

Less than a week later, on February 6, the Division received another referral regarding J.J., this time expressing concerns of drug dealing, based on people going in and out of J.J.'s apartment. The reporter believed J.J. was under the influence a few weeks prior, after observing her eyes glazed over and her demeanor different than normal. On the same date, the Division received the

results of J.J.'s February 1 urine screen, which tested positive for cocaine and marijuana.

In response to these developments, a caseworker – accompanied by local police – went to J.J.'s home to implement a safety protection plan. Upon arrival, the caseworker noted J.J.'s eyes appeared glassy and she acted irritated. J.J. picked up a brown box, placed an ashtray, cigarettes, and other items into it, then took the box into her bedroom. When the caseworker asked to see the brown box, J.J. complied. Upon examination, the box contained a device the police identified as a "weed grinder," with marijuana residue remaining. Nevertheless, J.J. denied recent marijuana use; instead, she noted she recently filled a prescription for Xanax. While J.J. did produce a pill bottle for a prescription filled on February 3, the prescription was for sixty pills, yet only eight pills remained. J.J. claimed she gave the remaining pills to a friend for "safe keeping," but refused to identify the friend. The caseworker explained the Division would initiate removal proceedings if a safety plan was not created. The caseworker attempted to implement a plan with Lisa supervising J.J.'s contact with Adam, but J.J. was not cooperative.

The police placed J.J. under arrest for possession of drug paraphernalia. After the police arrested J.J., the Division continued its efforts to implement a

safety protection plan, but eventually ruled out the possibility of Lisa acting as a supervisor for J.J., based on Lisa's hearing impairment and acquiescent personality. Therefore, the caseworker received instructions to conduct an emergency removal of Adam.[3]

Later the same day, the Division contacted Joel, who stated he pays child support to J.J. for Adam and enjoys regular contact with his son, including overnight visits in Joel's home. He claimed he was unaware of any substance abuse problems in J.J.'s home. He advised he was willing and able to care for Adam. Joel submitted a urine screen that day.

During a subsequent home inspection, a caseworker discovered a potent odor of marijuana in Joel's bedroom. Joel indicated he smoked marijuana about one week prior, but said he never did so when in a caretaking role. Joel agreed he would not use illicit substances while caring for Adam or his other children. Joel's February 6 urine screen came back positive for marijuana.

At the conclusion of its investigation, the Division determined its investigation established abuse and neglect of Adam by J.J. The day after the

_____

[3] The Division's removal of a child without a court order, commonly called a "Dodd removal," is authorized by the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. See N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

emergency removal of Adam, the Division filed a verified complaint and order to show cause in the Family Part, seeking care and supervision of Adam. Finding the Division made a prima facie showing Adam was abused or neglected, the court entered the order to show cause, granted the Division care and supervision of Adam, and granted the Division's application to grant Joel temporary physical custody, with J.J.'s consent. The court further ordered the Division to pay J.J.'s February 2017 rent, suspended Joel's child support obligation, and directed both parents to submit to random drug screenings and comply with substance abuse evaluation follow-ups.

J.J. began treatment at the Family Guidance Center of Warren County. She completed a psychiatric evaluation through the substance abuse program. J.J. was diagnosed with severe cannabis use disorder, mild cocaine stimulant use disorder, and mild major depressive disorder, recurrent episode. During this time period, J.J. provided urine screens positive for marijuana on February 7, 10, and 15; March 13; April 12, 20, and 26; May 4, 8, 23, and 25; and June 7, 15, 20, and 22, 2017. The April 26, 2017 drug screen was also positive for cocaine. On June 22, 2017, the Family Guidance Center recommended J.J. undergo higher level intensive care and discharged her.

A-4635-17T4

On June 29, 2017, J.J. completed a comprehensive bio-psycho-social assessment at High Point Program. On the same day, she submitted a urine screen that returned a positive result for marijuana. J.J. also failed a random drug screening on October 10, 2017, testing positive for marijuana. She failed to provide drug screenings in response to Division requests dated October 31, November 3, 13, and 28, 2017. J.J. missed a substance abuse evaluation scheduled for November 30, 2017, and then missed two rescheduled appointments.

Joel completed a substance abuse evaluation on February 15, 2017, and was recommended for Level I outpatient treatment. He provided urine screens on March 21, April 13, May 23, June 30, August 1 and 21, and December 22, 2017, as well as January 2 and 24, 2018, which all returned negative results for the presence of marijuana; however, Joel's screens for marijuana tested positive on December 8, 2017 and January 9 and March 20, 2018.

On September 5, 2017, the court held a fact-finding hearing. Two caseworkers testified for the Division. No other witnesses testified; however, the Law Guardian supported the Division's claim that J.J. abused or neglected Adam.

The court heard testimony of the caseworker response to the January 31 referral that Adam was found unattended in his apartment building's fourth-floor hallway. After the court overruled a relevancy objection, the other caseworker testified to J.J.'s continued involvement with the agency, which included her positive urine screens for marijuana and her non-compliance with substance abuse treatment after the February 6 removal date. Additionally, the caseworker testified J.J. was discharged from two substance abuse treatment programs for failure to submit a negative urine screen and nonattendance.

The court found as fact that J.J. slept as Adam escaped the apartment unattended. The court further found J.J. knew Adam had escaped before, yet "did not take appropriate action to remediate that, although that would have been fairly simple." The court observed "the fact that [Adam] was outside the apartment at [3 a.m.] certainly presents a risk of harm to the child." The court also found as fact that J.J. did not wake up until the responding officer shook her awake. Finally, the court found J.J. admitted using marijuana the night of Adam's escape, and that the Division found drug paraphernalia during a home visit. Based on the totality of the circumstances, the court concluded the Division proved J.J. abused and neglected Adam by a preponderance of the evidence, pursuant to N.J.S.A. 9:6-8.21.

On October 15, 2017, the court held a dispositional hearing. The court continued Adam in Joel's custody due to J.J.'s failure to comply with substance abuse services. The court noted J.J.'s apartment door was now secured with a latch lock, so the visitation schedule was altered to allow visits in J.J.'s home, in addition to Lisa's home, but with Lisa's supervision as a necessary condition. The disposition was slated for mediation and a G.M.[4] hearing was scheduled for January, 2018.

The G.M. hearing was ultimately held on April 19, 2018, because J.J. did not appear for the January hearing. A caseworker testified to the support offered to J.J. by the Division. Specifically, she testified about the substance abuse evaluations, substance abuse treatment, random drug screens, and the psychiatric evaluation. She recounted J.J.'s lack of cooperation with treatment, including her discharge from two separate programs for noncompliance, and her numerous missed scheduled evaluations, screenings, and treatment appointments, all while continuing to test positive for marijuana.

J.J. testified at the G.M. hearing. She acknowledged her marijuana use interfered with her parental rights as to three other children. She further

---

[4] N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382 (2009).

acknowledged she understood she needed to stop using marijuana to have physical custody of Adam. J.J. did not seek the return of Adam to her custody. Rather, through counsel, she sought "some sort of equitable order where both parents have time with [Adam] in the least restrictive environment . . . perhaps [Adam] would have to, would live day to day with [Joel] but [J.J.] would have liberal and regular visits and not have to be supervised on those visits." Adam's Law Guardian indicated Adam would enjoy overnight visits with J.J., but wanted to live with Joel. The Division argued both parents should share joint legal custody, but Adam should continue in Joel's sole physical custody.

The court determined the Division made reasonable efforts to assist J.J. in remediating the circumstances that precipitated Adam's removal, yet it was not safe to return Adam to J.J., due to her failure to remediate her substance abuse problems or demonstrate progress. The court noted Joel's "use of marijuana appears to be sporadic," with no resulting harm to Adam. Based on reports that Adam was doing well in his father's custody, including doing well at school, and "[b]ecause J.J. has not successfully treated her substance abuse addiction," making it "not safe to return Adam to her care," the court continued Adam in Joel's physical custody. The court granted J.J. supervised visitation, including

overnights, conditioned on the presence of an appropriate supervisor, and then terminated the litigation. This appeal followed.

## II.

Our scope of review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We owe substantial deference to Family Part judges' findings of fact because of their special expertise in family matters, id. at 413, especially where the evidence is largely testimonial and rests on the judge's credibility findings. Gnall v. Gnall, 222 N.J. 414, 428 (2015). We will not "disturb the 'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

"Abuse and neglect actions are controlled by the standards set forth in Title Nine of the New Jersey Statutes." N.J. Div. of Youth and Family Servs. v. P.W.R., 205 N.J. 17, 31 (2011). An abused or neglected child is defined as

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by

A-4635-17T4

unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court . . . .

[N.J.S.A. 9:6-8.21(c)(4)(b).]

Where there is no actual harm alleged, the focus is on the risk of future harm. Div. of Child Prot. & Permanency v. J.C., 440 N.J. Super. 568, 577 (App. Div. 2015). The "minimum degree of care" standard "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." Ibid. (citing G.S. v. Dep't of Human Servs., 157 N.J. 161, 177-78 (1999)). The inquiry "should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger." G.S., 157 N.J. at 182. Indeed, "[w]hen a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise minimum degree of care as a matter of law." Ibid.

After a fact-finding hearing is held pursuant to N.J.S.A. 9:6-8.44, if the court determines a child has been abused or neglected, a dispositional hearing is required to determine what order should issue. N.J.S.A. 9:6-8.45; see also N.J. Div. of Youth and Family Servs. v. J.C., 423 N.J. Super. 259, 266 (App. Div.

16

2011) (outlining stages of Title Nine proceedings).  The purpose of a dispositional hearing is to determine "whether the child may be safely returned to the custody of the parent from whom the child was removed."  N.J. Div. of Youth and Family Servs. v. N.D., 417 N.J. Super. 96, 107 (App. Div. 2010) (citing N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 402 (2009)).  N.J.S.A. 9:6-8.51 lists the options for an order of disposition:

> (1) suspending judgment in accord with section 32 hereof; (2) releasing the child to the custody of his parents or guardian in accord with section 33 hereof; (3) placing the child in accord with section 34 hereof; (4) making an order of protection in accord with section 35 hereof; (5) placing the respondent on probation in accord with section 36 hereof; (6) requiring that an individual found to have abused or neglected a child accept therapeutic services, and this order may be carried out in conjunction with any other order of disposition.
>
> [N.J.S.A. 9:6-8.51(a).]

"[A]n order of disposition placing a child with a person other than the parent from whose custody the child was removed may be entered pursuant to N.J.S.A. 9:6-8.51 only if there is first a finding of abuse or neglect."  N.D., 417 N.J. Super. at 110.  With these principles in mind we now turn to appellant's arguments.

J.J. argues the Division failed to prove abuse and neglect by a preponderance of the evidence at the fact-finding hearing. Relatedly, she avers it was error for the court to consider evidence of failed urine screens collected after the removal proceedings were initiated because they were irrelevant to the limited purpose of a fact-finding hearing on abuse and neglect and constituted hearsay.

The New Jersey Rules of Evidence define relevant evidence as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. "This determination focuses on 'the logical connection between the proffered evidence and a fact in issue.'" State v. Perry, 225 N.J. 222, 237 (2016) (quoting State v. Schnabel, 196 N.J. 116, 130-31 (2008)). The "logical connection" determination is directed to the court's discretion. See Verdicchio v. Ricca, 179 N.J. 1, 33-34 (2004). Such determinations are reviewed on appeal for an abuse of discretion. Id. at 34.

J.J.'s argument fails because it lacks support in the record. While the court heard testimony regarding J.J.'s positive urine screens collected after the emergency removal proceedings and admitted records of the screens into

evidence as business records, the court ultimately did not cite this evidence in its ruling of abuse and neglect.  Rather, the court reasoned:

> It's unknown how long [Adam] was up by himself.  It is a blessing that he did not get injured, but the fact that he was outside the apartment at 3 o'clock in the morning certainly presents a risk of harm to the child.
>
> The Court finds that the fact that the defendant was under the influence, did not wake up when the child left the premises, the fact that the defendant did not even wake up when the police broke down her door, did not wake up when the police yelled at her and shook her, finally to wake up:
>
> All of these the Court considers under the totality of the circumstances.  And based upon these findings of fact, the Court concludes that the Division has proven by a preponderance of the evidence that the defendant abused and neglected [Adam] while in her care.

Thus, it is clear the court did not consider J.J.'s subsequent failure to remediate her substance abuse issues as a basis for establishing abuse and neglect.  Therefore, any error regarding the admission of the urine screen results was harmless.  R. 2:10-2.

We turn now to J.J.'s argument it was error for the trial court to find it unsafe to return Adam to her care due to her continued substance abuse, without drawing the same conclusion with regard to Joel's past substance abuse.  We are

unpersuaded by this argument. A comparison of J.J. and Joel's purported or actual marijuana use is unnecessary for the following reason: there is no showing of a single incident where Joel's use of marijuana endangered Adam.

On the other hand, J.J. allowed Adam to escape the apartment undetected on two occasions. The court determined that at least the January 31 incident was related to J.J.'s substance abuse. J.J.'s subsequent and sustained failure to address her substance abuse convinced the court it could not safely return Adam to J.J.'s physical custody. Any potential error is mitigated by the fact J.J.'s legal custody has not been terminated, and she continues to have substantial contact with her son during her supervised visits. We agree with the trial court's finding that Adam "cannot be returned to J.J. until she has successfully completed a substance abuse treatment program." We are satisfied with the trial court's analysis and resultant disposition of the child.

Any arguments not specifically addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). The abuse and neglect judgment against J.J. and the subsequent disposition order placing the child with Joel are affirmed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4635-17T4