# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1742-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.M.F.,

     Defendant,

and

T.H., a/k/a T.H.,

     Defendant-Appellant,

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
M.E.F., a minor.

_____

Submitted January 10, 2022 – Decided February 3, 2022

Before Judges Rothstadt and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0001-20.

Joseph E. Krakora, Public Defender, attorney for appellant (Lauren M. Derasmo, Designated Counsel, on the brief).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy P. Fratz, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In this Title 30 guardianship case, T.H. (Thomas),[1] the father of M.F. (Matthew), appeals a Family Part order terminating his parental rights. The Law Guardian and the Division of Child Protection and Permanency urge that we uphold the trial court's decision. We affirm, substantially for the sound reasons detailed in the thoughtful February 10, 2021 written opinion that Judge Thomas J. Walls, Jr. issued at the conclusion of the trial.

---

[1] We use initials and fictitious names to protect the identity of the parties. R. 1:38-3(d)(12).

A-1742-20

I.

Matthew was born on August 30, 2016. His mother, J.M.F. (Janet), would not identify Matthew's father. As a result, and also due to her unresolved matter with the Division related to another one of her children, Matthew's half-sibling Katie, the Division initiated a Dodd removal[2] of Matthew. Janet would later surrender her parental rights to Katie and Matthew, who were ultimately both placed with B.D. and H.D. (Bernie and Harriet). Bernie and Harriet later adopted Katie and intend to adopt Matthew. In light of that voluntary surrender, Janet has not participated in this appeal.

Prior to Matthew's birth, the Division's first interaction with the family occurred in 2015, when allegations against Thomas of environmental child neglect were established. At that time, he lived with his aunt in Trenton but stayed most nights in an apartment with the mother of two of his children, where they lived in deplorable conditions. Those conditions improved before the investigation concluded and the Division accordingly closed its case without further involvement.

---

[2] A Dodd removal refers to an emergency removal of a child or children from a home without a court order, under the Dodd Act, which, as amended, is found at N.J.S.A. 9:6–8.21 to -8.82.

A-1742-20

In September 2016, Janet disclosed that she believed Thomas was Matthew's father and provided the Division with his mother, V.H.-H.'s (Vera), phone number as it was the only contact information that she had for him. The Division subsequently spoke with Vera, who stated she believed Thomas was living in North Carolina but did not know for sure. She also claimed she would try to contact him, and expressed her interest in caring for Matthew, but the Division advised paternity needed to be established before she could be assessed for placement.

After failing to hear from Thomas by December 2016, the Division followed up with Vera. She stated again that she was unsure of his whereabouts but indicated she would contact the Division in the event that changed. She asked if she could take a DNA test to help with confirming paternity, but the Division informed her they would need to do the test with Thomas, to which she responded he would not want to be involved.

Unbeknownst to the Division at the time, in March 2017, Thomas received a certificate of completion for a "24:7 DADS AM-PARENTING" fatherhood program through UIH Family Partners (UIH) in New Jersey. In addition, in May 2017, the Division learned that a final restraining order (FRO) was entered against Thomas based on an incident that occurred on March 24, 2017 with the

4

mother of one of his other children, and he was ordered to attend anger management treatment.

On May 4, 2017, the court entered a permanency order which found as appropriate and acceptable the Division's permanency plan of termination of Janet's parental rights followed by adoption. As a result, in August 2017 the court dismissed the then pending Title 9 litigation, and the Division filed a guardianship complaint shortly thereafter.

In early May 2017, a family friend requested to be considered as a placement for Matthew and Katie, but the Division determined it would be in the best interest of the children to remain with their current resource parents because the children had bonded with them, and the family friend was not willing to adopt the children. In September 2017, one year after Matthew's birth and still having had no contact with Thomas, the Division was able to arrange DNA testing of Vera, which confirmed she was Matthew's grandmother. After receiving the results, Vera again expressed her interest in Matthew being placed under her care, but her home did not pass the Division assessment due to her husband's criminal history. She also stated Thomas was upset she took the DNA test but claimed to not know his whereabouts or have updated contact information for him.

A-1742-20

In October 2017, the Division orally amended its complaint to add Thomas as a defendant. The Division began a missing persons search for Thomas, and, on December 18, 2017, unsuccessfully attempted to serve him with its complaint. That winter, Bernie and Harriet, Katie's resource parents, expressed interest in having Matthew placed with them. They eventually adopted Katie in November 2018 and expressed an interest in adopting Matthew as well.

In February 2018, after unsuccessful attempts by the Division to obtain contact information for Thomas, it met with T.H. (Tammy), his sister, who also expressed interest in Matthew being placed under her care. After an assessment, Tammy's home did not qualify for placement due to her home not having enough bedrooms to accommodate Matthew, but she was advised to contact the Division for reassessment if she moved to a home with more bedrooms. Tammy also assured the Division she would attend a scheduled court hearing on February 24th and would bring Thomas.

On February 24, the court held the scheduled hearing at which Thomas made his first appearance. He was served with the guardianship complaint and completed a 5A form for the assignment of counsel.

A-1742-20

Thomas stated he was unemployed and homeless. The court ordered him to comply with psychological and bonding evaluations. The Division met with him to arrange for services towards a goal of being unified with Matthew.

On March 26, 2018, after requesting assistance, the Division agreed to loan Bernie and Harriet funds for the down payment of a larger vehicle to accommodate Matthew who was then placed with them. On March 28, 2018, Thomas provided his phone number to the Division, and he was informed of the next scheduled court hearing and psychological and bonding evaluations. Thomas did not appear at the scheduled hearing, however.

On April 10, 2018, the Division provided transportation to Thomas for his psychological and bonding evaluations with David R. Brandwein, Psy.D. During the psychological evaluation, Thomas reported his memory was impacted from a car accident when he was thirteen years old, he had five children, was living with his mother until recently, was working at a gas station, had not been arrested in the past seven years, denied problems with substance abuse or having been arrested for a substance-abuse related charge, and denied that the Division was involved with any of his other children.

Dr. Brandwein noted Thomas's reported arrest record and substance-abuse history were both inconsistent with the information Thomas provided. During

7

the bonding evaluation, Dr. Brandwein observed Thomas's first interaction with Matthew, in which they appeared happy, engaged, and at ease with each other. Based on the evaluations, Dr. Brandwein determined Thomas had deficits in intellectual functioning, but did not believe they would be an obstacle in parenting children. Dr. Brandwein, however, did not endorse independent parenting for Thomas at that time, or termination of his parental rights, as he concluded there was not enough evidence at that time to suggest termination would do less harm than good for Matthew.

Dr. Brandwein also recommended that within ninety days Thomas complete a substance abuse evaluation and an anger management program; resolve all outstanding warrants; have his home assessed; comply with hair follicle testing, meet with an in-home parent mentor, and participate in weekly three-hour supervised visitations with Matthew. He also stated that Thomas's failure to comply with those recommendations would suggest that termination of parental rights would be a reasonable outcome, but compliance would indicate that reunification should be the goal.

Thomas did not appear at the next scheduled court hearings held on April 12 and 13, 2018, despite the court continuing the hearing for a second day to provide him the opportunity to attend and his agreement to do so. At the hearing,

A-1742-20

the Division maintained Matthew's permanency plan to that of termination of parental rights within the next three to six months, which the court found reasonable. The court also ordered the Division to provide Thomas with the services Dr. Brandwein recommended, and ordered Thomas to comply with those recommendations, including weekly supervised visits.

Between that hearing and the next, Thomas showed a partial commitment to reunification with Matthew. For example, he attended three scheduled visits, but requested the Division cancel the fourth. Also, the Division visited Thomas's home to assess it. When asked about other children in the home, Thomas replied the Division was there only for Matthew, and two weeks later stated his other children no longer lived there. Finally, background checks conducted by the Division discovered outstanding warrants, which Thomas agreed to satisfy.

At the May 25, 2018 hearing, the Division voluntarily amended Matthew's permanency plan from termination to reunification, which the court found reasonable due to Thomas's initial compliance with services. The court accordingly entered a permanency order dismissing the guardianship litigation with the matter returning to the Title Nine docket.

A-1742-20

Unfortunately, between that permanency hearing and the next scheduled proceeding, Thomas did not comply with services and visits. By way of example, he missed many scheduled visits and would repeatedly fail to confirm his visit the day before as instructed. On other occasions, Thomas would confirm his attendance but not appear. The Division also attempted to accommodate scheduled visits around Thomas's changing work schedule.

Thomas reported he was unemployed at times, and each time he reported he moved, the Division would assess his new residence for suitability. The court increased the duration of his visits and ordered the Division to assess any family member Thomas provided to supervise visitations. At each case management review, some of which Thomas did not attend or attended by phone, the court found Thomas was not fully complying with services and ordered him to comply.

As of the May 28, 2019 permanency hearing, Thomas still was not fully complying with services. The Division accordingly amended its permanency plan to termination of parental rights within six months, which the court found appropriate and acceptable. The court again ordered Thomas to comply with services.

A-1742-20

Between the permanency hearing and the start of trial, Thomas failed to attend consistently scheduled visits with Matthew despite that the visits had been scheduled around his work schedule, including make-up visits that occurred after he consented to Bernie and Harriet taking Matthew on a several-week long vacation. He reportedly started several new jobs, but at trial the Division's adoption case worker testified she had not received corresponding paystubs, which Thomas was required to provide from each employer.

When COVID-19 restricted in-person visits, the Division arranged for phone and video calls between Thomas and Matthew, which Thomas also frequently failed to attend in full or in part by being late or disconnecting abruptly. Also, when Thomas reported he had moved, the Division assessed his new home, including his uncle James's home, where Thomas stayed a few nights a week. By the time trial concluded, Thomas's mother stated he had a total of seven children, none of which lived with him.

On September 25, 2019, Dr. Brandwein conducted a second set of psychological and bonding evaluations of Thomas. Thomas acknowledged he failed to attend all scheduled visits with Matthew, and forgot at times to confirm his visits, but claimed this was due to his inflexible work schedule. Dr. Brandwein also observed Thomas with Matthew and noted they appeared at ease

A-1742-20

and affectionate, that Thomas directed Matthew appropriately, but that Matthew did not show distress from being separated from Thomas.

Based on his observations, Dr. Brandwein opined Thomas's actions in failing to care for Matthew and address his instability harmed and continued to harm Matthew such that "permanent placement of [Matthew] with [Bernie and Harriet] [was] the option that [would] result in more good than harm for Matthew." He based this conclusion, in part, on Thomas's doubtful long-term commitment to Matthew as evidenced by his failure to consistently comply with services, including visitations, and his history of housing and employment instability. He accordingly recommended termination of Thomas's parental rights.

The next day, Barry A. Katz, Ph.D., conducted a bonding evaluation of Matthew, Bernie, and Harriet, and Matthew's half-sibling, Katie, and another child in their care, and on October 1, conducted the same of Matthew and Thomas. Dr. Katz observed Thomas and Matthew and noted Thomas arrived late, there was no physical contact between the two, and Matthew left without saying goodbye. Thomas did not complete a psychological evaluation with Dr. Katz due to his late arrival and failure to appear at subsequent appointments.

12

Based on his observations, Dr. Katz also recommended termination of Thomas's parental rights, which he opined would result in more good than harm for Matthew. He attributed this to Thomas's inconsistency with visits, his history of instability with housing and employment, and lack of compliance with other court-ordered services. Dr Katz explained that Matthew would suffer severe and enduring harm if he were removed from Bernie, Harriet, and Katie, which Thomas would not be able to ameliorate.

On October 12, 2020, Dr. Brandwein conducted an updated record review regarding Thomas and Matthew, as well as a sibling bonding evaluation between Matthew, Katie, and Bernie and Harriet's other two children. Based on his observations, he concluded severing sibling bonds would cause severe and enduring harm to Matthew, which Thomas would not be able to address adequately. Accordingly, Dr. Brandwein found no reason to alter his previous opinions and recommendations.

Judge Walls conducted the guardianship trial over nine non-consecutive days between February and December 2020. At trial, the Division called case workers Lloyd Kennedy and Wanda Hernandez, Dr. Brandwein, and Vera. The Law Guardian relied on the testimony of Bernie and Dr. Katz. Thomas testified and called as witnesses T.M. (Tess), his paternal aunt; James, his uncle; and UIH

13

client service specialist, William Davis as witnesses. The court found the doctors, the Division's caseworkers, Vera, Bernie, James, and William Davis all credible. The court found Thomas not credible, Tess's testimony "not convincing" and accordingly did not ascribe it substantial weight.

After considering the evidence, the judge determined that the Division had established, by clear and convincing evidence, all four prongs of the Title 30 criteria for the termination of parental rights. At the time of trial, those well-established statutory prongs were:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;[3]
>
> (3) [The Division] has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement

---

[3] Recent legislation amended N.J.S.A. 30:4C-15.1 and removed the second sentence from subsection (a)(2), effective July 2, 2021 ("Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child."). L. 2021, c. 154, § 3814.

outside of the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:C-15.1(a); see also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986) (reciting the four controlling standards later codified in Title 30).]

Under prong one, Judge Walls concluded that "a continued relationship between [Thomas] and [Matthew] would result in endangerment to [Matthew's] safety, health, or development." He based this conclusion on Thomas's lengthy pattern of housing and employment instability, and his lack of commitment to care for Matthew demonstrated by his inconsistency in attending visits and not pursuing a relationship with Matthew for an extended period of time beginning when he became aware that he was Matthew's father.

With respect to prong two, Judge Walls found Matthew would suffer if permanent placement were not resolved promptly, given Thomas's unwillingness to commit consistently to care for Matthew, and Thomas's inability to provide stability in housing or employment. The judge also relied on Dr. Brandwein and Dr. Katz's opinions that "removing [Matthew] from [Bernie and Harriet's] care would cause both severe harm and enduring trauma to [Matthew]."

15

As to prong three, Judge Walls found the Division provided reasonable services, explored alternatives to termination of parental rights, and ruled out many of Thomas's relatives. It based these conclusions on the Division's placement of Matthew in two resource homes, its extensive efforts to locate Thomas and confirm paternity, assessments of Thomas's family members for placement of Matthew, and services the Division offered to Thomas, including visitation, programs, therapy, evaluations, meetings, and transportation. Additionally, the court considered that the Division voluntarily amended its permanency plan to reunification with Thomas, which ultimately reverted to termination of parental rights based on Thomas's non-compliance with services.

Finally, under prong four, Judge Walls relied on the unrebutted expert testimony and opinions of Dr. Brandwein and Dr. Katz that Matthew would suffer more harm than good if he were removed from his current resource home due to his bond with his resource parents and siblings formed over several years; and termination would cause more good than harm because, although Matthew has a familiar bond with Thomas, he does not view Thomas as a parental figure, and permanency in the form of adoption would provide stability that Thomas was not able to provide.

16

II.

This appeal by Thomas followed in which he challenges Judge Walls' findings on all four of the statutory criteria. Specifically, Thomas argues the record is insufficient to support a finding of harm that meets the standard of prongs one and two. He contends he was blameless for Matthew's initial removal. Additionally, he claims his "history of unstable housing and employment" was "rectified" by the time of trial and Dr. Brandwein reported he was "not, by definition, an unfit parent." He also argues he should benefit from an inference that he attended more visits than the record supports because the Division "provided only shoddy records of the visits." He further explains his missed visits as a product of the Division not accommodating his inflexible work schedule. Last, Thomas maintains Judge Walls was required to resolve any uncertainty it had about his instability causing future harm to Matthew in his favor, which he failed to do.

Thomas also argues as it relates to prong three, that the Division did not prove by clear and convincing evidence that it made reasonable efforts to provide services to help him correct his instability and lack of nurturing. He contends the services provided by the Division were unnecessary and duplicative because he had completed classes in the past and "it was clear that

17

[he] was a good father." He claims his case is similar to <u>N.J. Div. of Child Prot. & Perm. v. J.C.</u>, 440 N.J. Super. 568, 580 (App. Div. 2015), where doctors determined the parent did not present with substance abuse issues, yet the court improperly ordered the parent complete a substance abuse program.

Moreover, he contends reasonable efforts were not made in providing visitation services because they were delayed by the Division failing to locate him, and, when they commenced, they were inexplicably supervised, which deprived him of a "meaningful opportunity to cultivate a relationship" with Matthew. Further, he asserts the Division undermined his rights by giving Matthew's resource parents "total control over communications" during the COVID-19 restricted visitations; by "buying them a new vehicle to accommodate Matthew, but provid[ing] no assistance to [him];" by permitting the family to go on several vacations, which Thomas was "coerce[d]" into consenting to by "essentially bribing him" with make-up visitation; and by not providing increased visitation throughout the litigation. Thomas also argues the court did not properly consider alternatives to termination of parental rights by ignoring reunification with Thomas in James's home and failing to assess relatives for placement.

Finally, as to prong four, Thomas argues the court's finding that termination would not do more harm than good to Matthew was not supported by substantial credible evidence. He claims he was a fit parent, and as bonded with Matthew as he could be after all the Division's failures, that "Matthew will lose important sibling and paternal family bonds," and "[t]he court did not consider the long-term harm to Matthew that is inherent to termination of parental rights." Finally, he asserts the court was "clearly swayed by the superior lifestyle the foster parents can afford."

We reject these contentions. In his one-hundred-twelve-page written decision, Judge Walls made detailed factual findings that rebut each of Thomas arguments and we accordingly affirm based on his thoughtful and comprehensive analysis contained therein. We provide the following comments to amplify our decision.

## III.

Our review of this appeal is guided by well-settled standards for termination cases. In such cases, the trial court's findings generally should be upheld so long as they are supported by "adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). A decision in this context should only be reversed or altered on appeal

if the trial court's findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004).

We must give substantial deference to the trial judge's opportunity to have observed the witnesses firsthand and to evaluate their credibility. R.G., 217 N.J. at 552. We also must recognize the considerable expertise of the Family Part. N.J. Div. of Child Protection & Permanency v. B.H., 460 N.J. Super. 212, 448 (App. Div. 2019). That said, we apply de novo review to the Family Part judge's rulings on pure questions of law. R.G., 217 N.J. at 552.

Parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). "The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights . . . ,' and 'rights far more precious . . . than property rights.'" Stanley v. Illinois, 405 U.S. 645, 651 (1972) (internal citations omitted). "[T]he preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare." N.J.S.A. 30:4C-1(a); see also K.H.O., 161 N.J. at 347.

The constitutional right to the parental relationship, however, is not absolute. R.G., 217 N.J. at 553; A.W., 103 N.J. at 599. At times, a parent's

interest must yield to the State's obligation to protect children from harm. <u>N.J. Div. of Youth & Family Servs. v. G.M.</u>, 198 N.J. 382, 397 (2009); <u>In re Guardianship of J.C.</u>, 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test for determining when a parent's rights must be terminated in a child's best interests, codified at N.J.S.A. 30:4C-15.1(a). We discuss each prong in the context of the trial evidence and the court's attendant findings below.

A.    <u>Prongs One and Two</u>

The record supports Judge Walls' finding that Matthew suffered harm from a delay in permanent placement and Thomas was unable or unwilling to overcome the circumstances that caused, and would have continued to cause, harm to Matthew. The commencement of that harm can be traced to Thomas's decision not to become involved in Matthew's life until April 2018, when Matthew was twenty months old, despite being fully aware of his paternity. Nearly three years after Matthew's placement with Bernie and Harriet, Thomas was unable to assume custody of him due to his instability in housing and employment, which evidenced, according to the unrebutted expert testimony, a lack of commitment to establishing a permanent home for Matthew.

Thomas also repeatedly failed to comply with court orders and the Division's recommendations. Instead, his neglect of Matthew continued as established by his erratic visitation and failure to meaningfully engage in his life for an extended period of time.

His inconsistent visits with Matthew are not insignificant as they left Matthew neglected and lacking sufficient nurturing from his biological father. And, although Thomas points to instances of his positive behavior and conduct, which we acknowledge, a more complete and accurate summary of his conduct shows repeated and continued noncompliance with orders and recommendations, along with his inability to provide a safe, stable home for Matthew. We are satisfied that such behavior demonstrates that it was unlikely he would be able to cease any future harm to Matthew. See K.H.O., 161 N.J. at 352-53; see also In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999) ("A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." (citing K.H.O., 161 N.J. at 352-54)).

We are also satisfied that Judge Walls' findings that Thomas failed to maintain stable employment and housing are fully supported by the record. These actions prevented Matthew from obtaining the permanency that was

22

necessary for his well-being. As Dr. Brandwein testified, "Matthew needs permanency now." D.M.H., 161 N.J. at 383 ("a delay in establishing a stable and permanent home" can constitute endangerment that "will cause harm" to a child).

B.      Prong Three

The judge also found that the Division reasonably assisted Thomas to correct the circumstances which led to Matthew's removal and also considered alternatives to termination of parental rights. Like Judge Walls' findings related to prongs one and two, his factual findings as to prong three are similarly supported by substantial credible evidence in the record.

The Division offered Thomas psychological and bonding evaluations, parenting skills and anger management classes, supervised visitation, and urine screens. Contrary to Thomas's assertion, the services he received were not unnecessary, as Dr. Brandwein determined Thomas failed to nurture Matthew for a significant period of his young life. He appropriately recommended all the services Thomas needed to support reunification with Matthew. We also note that when Thomas was complying with services and visits, the Division amended its permanency plan from termination of parental rights to

reunification. The circumstances presented here are clearly distinguishable from those in J.C.

We also reject Thomas's argument, relying primarily on his prior completion of the program at UIH, that the Division's efforts were duplicative. After failing to respond to the Division's repeated efforts to locate him so that he could be involved in Matthew's life, it was hardly unreasonable for the Division to require an evaluation before Matthew could be placed in his care. That evaluation resulted in Dr. Brandwein concluding that additional services were needed.

Judge Walls also correctly concluded that the Division considered alternatives to terminating Thomas's parental rights. First, as noted, reunification of Matthew with Thomas was considered and ultimately rejected, and Bernie and Harriet unequivocally expressed their desire to adopt Matthew.

The judge also properly found that the Division explored Thomas's relatives to care for Matthew, including James and Tess. James was not willing to care for Matthew, and the court found Tess's commitment unconvincing as she lacked knowledge about Thomas and the Division's prior involvement with him and failed to express continued interest in Matthew's care. Finally, although

24

Matthew was placed with non-relatives, he has had the benefit of living with his half-sister in that home for over three years and is securely bonded to her.

C.    Prong Four

The judge also found that the Division had clearly and convincingly established that termination of Thomas's parental rights would not do more harm than good. Judge Walls' findings as to this prong are also supported by sufficient credible evidence, including Dr. Katz's and Dr. Brandwein's testimony.

The overwhelming evidence at trial supported the conclusion that termination of Thomas's parental rights was in the best interest of Matthew. By way of example only, Thomas acknowledged the importance of sibling bonds, yet his position would sever the only bond he has with a biological sibling in favor of potential bonds with siblings he has never met. Thomas also misrepresents Dr. Brandwein's opinions in arguing he was a fit parent, as that does not accurately represent Dr. Brandwein's final views on Thomas's ability to safely parent Matthew.

The testimony of Drs. Brandwein and Katz that Matthew would not be harmed as a result of terminating Thomas's parental rights, and that if any harm occurred, Bernie and Harriet could ameliorate it, was unrebutted. Further, both experts testified that removal from Bernie and Harriet would likely result in

"both short-term and enduring harm" which would be exacerbated by Thomas's likeliness of continued instability in housing, employment, and caregiving.

Further, even were we to ignore the harm predicated by Matthew's removal from his resource parents and siblings, termination of Thomas's parental rights was fully supported by Matthew's need for permanency and Thomas's inability to provide that stability to him now and in the future. See e.g., New Jersey Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 592-93 (App. Div. 1996).

In sum, after our thorough consideration of the record, including the positive documentation regarding Thomas's visits and the services and counseling he completed, we conclude that the judge's findings were clearly and convincingly supported by the evidence and are entitled to our deference. R.G., 217 N.J. at 552. To the extent we have not specifically addressed any of Thomas's remaining arguments it is because we find them to have insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION